### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**KAIVAC, INC.,**

       **Plaintiff,**

  **v.**                       **Case No. 1:19–cv–410**

                                    **JUDGE DOUGLAS R. COLE**

**VINCENT STILLWAGON,**

       **Defendant.**

### OPINION AND ORDER

This cause comes before the Court on Kaivac, Inc.'s Motion for Summary Judgment and Attorney's Fees (Doc. 30). For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Kaivac's Motion.

### BACKGROUND

Kaivac is a company based out of Hamilton, Ohio that develops hygienic cleaning systems for building occupants. Kaivac sells those systems and related products to customers in over forty states and internationally. To attract new customers and support existing ones, Kaivac employs dedicated sales and technical-support teams. (Towes Decl., Doc. 29-6, #403–04 ¶¶ 5–7).

One of the customer-connection tools that Kaivac uses is YouTube. As most internet users know, YouTube is a video-sharing website. The site allows a member to create "channels," which allow other users to find content posted by that member. In 2015, Kaivac created two such channels on YouTube. (Metzler Decl., Doc. 29-2, #335 ¶¶ 5–6). It called one of these channels "Kaivac in the Field," and the other

"Kaivac Tech Support." Kaivac's Creative Media Manager, Karl Metzler, created the channels using Kaivac's password-protected Google account affiliated with its email address: kaivacinthefield@gmail.com. (*Id.*, #335 ¶ 6). A person can upload videos to a YouTube channel only when the person is logged into the account using Kaivac's Google account credentials.

The Kaivac in the Field channel featured video content that sales personnel captured and uploaded directly with their smartphones during demonstrations and sales calls. (*Id.* ¶¶ 7–8). These videos helped Kaivac's sales team illustrate successful techniques and methods to potential customers on demand. (*See id.*, #335–36 ¶ 9). In 2018, the Kaivac in the Field channel included approximately 20 videos. Those videos were viewed over 800 times in 2018 and over 350 times in 2019. (*Id.*, #337 ¶ 16). According to Metzler, "[t]he videos were of significant value to Kaivac for the role they played in generating business and maintaining customer relationships." (*Id.*, #335 ¶ 9).

The Kaivac Tech Support channel, on the other hand, housed videos demonstrating how to maintain Kaivac's cleaning machines. Kaivac's technical support team developed the content of the videos, and Kaivac's video department produced the videos using professional tools. Metzler would then upload the videos to the Kaivac Tech Support channel using his work computer. Kaivac's Tech Support channel housed 14 videos and cost over $75,000 to make. (*Id.*, #336 ¶ 10). They were viewed over 6,500 times in 2018 and over 4,300 times in 2019. (*Id.*, #337 ¶ 17).

2

Because a person must be logged into Kaivac's Google account in order to upload content to its channels, Kaivac shared its Google password with members of its sales team, thus allowing them to sign in and upload video content from their smartphones to the Kaivac in the Field channel. Because they had the password, members of Kaivac's sales team also had the ability (although not the permission) to *delete* video content from both YouTube Channels. (*Id.*, #336 ¶ 12). Kaivac itself nonetheless "owned the right, title, and interest to the videos." (Kaivac Opening Br., Doc. 30-1, #410; *see also* YouTube Terms of Service, available at https://tinyurl.com/y62s93c8 (effective May 25, 2018) ("You retain all of your ownership rights in your Content.")).

Defendant Vincent Stillwagon was a member of Kaivac's sales team from August 25, 2011 until April 5, 2017. (Towes Decl., Doc. 29-6, #404 ¶ 8). As such, Kaivac provided him the password to its Google account, and Stillwagon thus had the ability to log his device in using Kaivac's Google account credential and thereby add video content to (and delete content from) Kaivac's YouTube channels. (Metzler Decl., Doc. 29-2, #336 ¶¶ 11–12). While employed with Kaivac, Kaivac provided Stillwagon a cell phone that it intended he use for business purposes. Stillwagon also, however, had a personal iPhone 6. (Stillwagon Interrog. Resp., Attached as Ex. J to First Am. Compl., Doc. 24, #264). When Stillwagon left Kaivac, he returned the phone Kaivac had issued him, but kept his personal iPhone 6. (*Id.*).

About two years after Stillwagon left the company, on April 16, 2019, Metzler received an unusual email from Kaivac's Technical Support Specialist, Austin Green.

Green informed Metzler that, while trying to access Kaivac's Tech Support channel, Green encountered a message stating, "this channel doesn't have any content." (Metzler Decl., #337–38 ¶19). Metzler then checked the channel himself and saw the same message. He immediately began investigating what happened to the videos. He first logged into Kaivac's Google account and navigated to a page called "Creator Studio." There he discovered that all of the videos previously housed on either the Kaivac Tech Support or Kaivac in the Field channels had been deleted. (*Id.*, #338 ¶ 20).

Metzler navigated to a page in Kaivac's Google account that listed "[d]evices that have been active on your account in the last 28 days, or are currently signed in." Metzler saw that only two devices were listed: (1) a "Windows" computer in "Hamilton, OH, USA" labeled "THIS DEVICE"—meaning, the Kaivac-owned computer that Metzler was using at that moment; and (2) a smartphone labeled "vince's iPhone" in the "United States," which last accessed a Google product or service while logged into Kaivac's Google account that day (i.e., April 16, 2019).[1] The next day, i.e., April 17, Metzler returned to this page to preserve this data. The page reflected the same information, with one addition: it again showed that "vince's iPhone" was last active while logged in using Kaivac's Google account credentials on

---

[1] A forensic expert that Kaivac retained for this lawsuit explains, and Stillwagon does not dispute, that "[t]o access the [Google] account in such a way as to display on the 'My Recent Devices' log, the account username and password must be entered on a web page for a Google product." (Daley Expert Report, Doc. 29-1, #291).

April 16, 2019, but now showed a last-access time of 11:35 p.m.[2] (i.e., shortly before midnight). This time stamp meant that hours *after* Metzler's investigation began, "vince's iPhone" had again accessed a Google product or service while logged into Kaivac's Google account. (*Id.* ¶ 21). Metzler took a screenshot of this page (attached as Exhibit B to Kaivac's Amended Complaint). Metzler later navigated to a webpage on Kaivac's Google account containing data analytics. That webpage revealed that all video views had ceased on or around April 14, 2019, indicating that someone deleted the videos on or around that date. (*Id.* at #338–39 ¶¶ 23–24).

These facts caused Kaivac to suspect that Vincent Stillwagon had deleted the videos. Stillwagon was the only individual who went by "Vince" to whom Kaivac had provided the password to its Google account. (Metzler Decl., Doc. 29-2, #338 ¶ 22). And Kaivac had not changed its password until the day after it discovered its videos had been deleted. (*Id.* ¶ 27). Moreover, Kaivac's lawyers later retained forensic analysts who uncovered additional facts that supported Kaivac's initial suspicion. These analysts performed data collections (with Stillwagon's consent) of Stillwagon's iCloud account, Stillwagon's new iPhone XS (Stillwagon discarded his iPhone 6 in July 2019), and Kaivac's Google account.

While accessing Stillwagon's iCloud account, one of the analysts, Aaron Liang, discovered a backup for an iPhone 6s with the identifier "vince's iPhone." (Daley

---

[2] Metzler stated in his declaration that he saw "vince's iPhone" had last accessed the account on April 16, 2019 at 11:58 p.m. (Metzler Decl., Doc. 29-2, #338 ¶ 21). But the screenshot he took at the time (and that Kaivac attached to its First Amendment Complaint) indicates that "vince's iPhone" last accessed the account at 11:35 p.m. that day. (First Amend. Compl., Doc. 24, #221).

Expert Report, Doc. 29-1, #293 ¶ 21). Another analyst, James Daley was able to retrieve pertinent data from this iPhone 6s back up, such as log files, searched items, timeline data, various web artifacts (including history), installed applications, pictures and videos, and location history. (*Id.* at #294 ¶ 25). By comparing the information from Stillwagon's phone data with the information associated with Kaivac's Google account, Daley "was able to identify multiple instances where records overlapped either by location, search criteria, subject, or date/time stamps." (*Id.* at #295 ¶ 27). This indicated that the owner of "vince's iPhone" *routinely* accessed Google products or services (such as the Google search page) while the device was logged in using Kaivac's Google account credentials. For example, Daley discovered web search records on Kaivac's Google account from September 1, 10, 11, and 24 in 2018 concerning lodging, iPhone repair, weather, and state unemployment information—all relating to the Murrells Inlet, South Carolina geographic area. That coincided with location data and activity logs created on or about those dates that Daley collected from Stillwagon's iPhone data. (*Id.* at #297 ¶ 31).

Daley also examined the screenshot that Metzler took on April 17, 2019 indicating that the last device to access any Google service while logged into Kaivac's Google account was "vince's iPhone" from the day before at 11:35 p.m.—the day that Metzler learned that Kaivac's YouTube videos had been deleted. "Based on the web address visible in the top quadrant of the image and the administrative access that [Daley] was granted to review the same log on or about December 4, 2019," Daley concluded that this was "an accurate and true representation of what the log data

6

displayed at that date and time." (*Id.* at #295–96 ¶ 28). Daley also confirmed as "true and accurate" Metzler's screenshot of a YouTube analytics webpage indicating that all activity on Kaivac's YouTube channels reduced to zero or near zero on April 14, 2019.[3] (*Id.* at #296 ¶ 29).

Daley reached several conclusions as a result of his analysis, some simply confirming Metzler's initial investigation. Among them were that: (1) Stillwagon repeatedly accessed Kaivac's Google Account following termination of his employment from Kaivac up through April 16, 2019; (2) all video views on Kaivac's YouTube channels ceased on or about April 14, 2019; (3) for a device to appear on the "My Recent Devices" log on Kaivac's Google account, the account username and password must have been entered on a web page for that Google product, such as Gmail or YouTube; (4) the only devices that accessed the account during the window of time that the videos were deleted were "vince's iPhone" and Metzler's work computer; (5) "vince's iPhone" was the identifier for a phone that Stillwagon used during his employment at Kaivac, through at least June 29, 2019; and (6) the same "vince's iPhone" that was recorded accessing Kaivac's Google account around the time that the videos were deleted was also the device that was identified from a backup of Stillwagon's iCloud account; (7) there were only two devices that accessed Kaivac's Google account at the time of deletion, "vince's iPhone" and Metzler's work computer;

---

[3] In this part of his report, Daley stated that the screenshot showed that all activity on Kaivac's YouTube channels had reduced to zero or near zero on April 15, 2019. (Daley Expert Report, Doc. 29-1, #296 ¶ 296). But that was likely a typo because, in discussing the conclusions of his analysis, Daley said that all video views ceased on or around April 14, 2019. (*Id.*, #298 ¶ 34). And that is consistent with what Metzler stated in his declaration. (Metzler Decl,, Doc. 29-2, #339 ¶ 23).

(8) thus, "[a]bsent any other unknown factors, the data available shows that one or potentially both of these devices was used to delete media from the Kaivac YouTube Channel." (*Id.* at #290–91, #298–99).

Kaivac eventually filed the instant suit against Stillwagon. Its operative complaint alleges five claims: (1) violation of the Computer Fraud and Abuse Act—18 U.S.C. §§ 1030(a)(5) and 1030(g); (2) intentional interference with business relationships; (3) civil liability for vandalism under O.R.C. §§ 2307.70 and 2909.05; (4) breach of contract; and (5) intentional spoliation of evidence. (First Am. Compl., Doc. 24, #206–11). For relief, Kaivac requests that the Court award Kaivac compensatory damages, punitive damages, attorneys' fees and costs, and any other relief "that may be just and required under the circumstances of this case." (*Id.* at #211).

Kaivac has now moved for summary judgment on its first, third, fourth, and fifth claims for relief. (Doc. 30). In the same motion, Kaivac simultaneously moves for attorneys' fees under O.R.C. § 2307.70(A). (*Id.*). Although not expressly noted, it appears that the motion may be more aptly described as a motion for *partial* summary judgment. In particular, as to the first, fourth and fifth claims for relief, it appears that the motion seeks judgment only as to liability, and not damages, as the motion does not seek to show the alleged damages associated with those three claims. As for the third claim, it appears the motion seeks an award of attorneys' fees as *partial* satisfaction of the relief to which Kaivac claims it is entitled.

Independent of how it is correctly labeled, there is no question that Kaivac's motion is now ripe for the Court's decision. The Court addresses Kaivac's arguments in three steps: The Court begins by addressing Kaivac's summary judgment motion with respect to its first, third, and fourth claims—all of which boil down to one question: is there a genuine dispute as to who deleted Kaivac's YouTube videos in April 2019? Then the Court addresses Kaivac's request for an award of its attorneys' fees, which largely turns on the Court's resolution of Kaivac's third claim for relief. Finally, the Court addresses Kaivac's summary judgment motion with respect to its fifth claim for relief, alleging intentional spoliation of evidence.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to sua sponte search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). Rather, the burden falls upon the nonmoving party to "designate specific facts or evidence in

dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

### A. Kaivac is entitled to summary judgment on liability as to its first, third, and fourth claims.

The Court first addresses the question of whether Kaivac is entitled to summary judgment as to liability on its first, third, and fourth claims—alleging violation of the Computer Fraud and Abuse Act, civil liability for vandalism, and

10

breach of contract, respectively. Kaivac's prospects for success on these claims depends exclusively on whether the Court agrees with Kaivac that there is no "genuine" dispute that Stillwagon was the person who deleted Kaivac's YouTube videos. That is, the parties do not dispute that Stillwagon is liable under the relevant statutes and contract if, in fact, he intentionally deleted Kaivac's YouTube videos. Rather, their arguments focus solely on that predicate fact—whether, based on the totality of the record evidence, there is a "genuine" issue that Stillwagon was the person who deleted the videos. Accordingly, if no such dispute exists, then Kaivac is entitled to summary judgment. Nonetheless, for the sake of completeness, before exploring that factual question, the Court will begin by briefly describing the statutory and contractual provisions that Kaivac alleges Stillwagon violated.

First up is a federal statute called the Computer Fraud and Abuse Act ("CFAA"). The CFAA prohibits an individual from:

> (A) knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization to a protected computer;
>
> (B) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage; or
>
> (C) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss.

18 U.S.C. § 1030(a)(5); *see also* §§ 1030(g) & 1030(c)(4)(A)(i)(I) (creating a cause of action for anyone "who suffers damage or loss by reason of a violation" that "caused … loss to 1 or more person during any 1-year period … aggregating at least $5,000 in value"). Kaivac argues that "[n]o matter whether analyzed under subsections (A), (B),

11

or (C), the result is the same: Stillwagon violated the CFAA and is liable for Kaivac's damages." (Kaivac Opening Br., Doc. 30-1, #418).

Next up is an Ohio statute prohibiting vandalism. That statute says that "[no] person shall knowingly cause physical harm to property that is owned or possessed by another, when either of the following applies:"

> (a) The property is used by its owner or possessor in the owner's or possessor's profession, business, trade, or occupation, and the value of the property or the amount of physical harm involved is one thousand dollars or more;
>
> (b) Regardless of the value of the property or the amount of damage done, the property or its equivalent is necessary in order for its owner to engage in the owner's or possessor's profession, business, trade, or occupation.

O.R.C. § 2909.05(B)(1); *id.* § 2307.70 (creating a cause of action for "[a]ny person who suffers injury or loss to person or property as a result of an act committed in violation"). Kaivac argues that Stillwagon "'knowingly' caused the deletion" of Kaivac's videos that were worth more than one thousand dollars and that were "necessary for Kaivac to support its sales force and customers." (Kaivac Opening Br., Doc. 30-1, #422). Thus, argues Kaivac, "[a]ll elements of the statute are satisfied and Stillwagon's liability is indisputable." (Kaivac Opening Br., Doc. 30-1, #422).

Kaivac's breach of contract claim, meanwhile, is based on a Confidentiality Agreement that it executed with Stillwagon at the beginning of his employment with the company. Among other things, this agreement prohibited Stillwagon, after his employment ended, from using any of Kaivac's "Confidential Information" (a term that is defined in the agreement) "for any purpose" without Kaivac's "prior written approval." (Confidentiality Agreement, Doc. 24, #214). This agreement also required

12

Stillwagon, within five business days after his employment ended, to return to Kaivac all "Confidential Information" that he possessed and to not retain any copies of such information. (*Id.* at #214–15). Kaivac argues that Stillwagon violated the Confidentiality Agreement by retaining Kaivac's Google password even after his employment with Kaivac ended and using it to access Kaivac's Google account and delete Kaivac's YouTube videos. (Kaivac Opening Br., Doc. 30-1, #424).

Again, none of Kaivac's interpretations of these statutes and contractual provisions is in dispute. The parties essentially, if implicitly, agree that *if* Kaivac has shown there is no genuine dispute that Stillwagon intentionally deleted Kaivac's YouTube videos, then Kaivac is entitled to summary judgment on its first, third, and fourth claims. The sole question, then, is whether Kaivac met that burden. The Court concludes that it has.

As an initial matter, it is worth noting that Kaivac supported its summary judgment motion with dozens of undisputed facts that it accumulated through internal investigations, data collections, and forensic analysis. Included within this evidence was Daley's expert report based on, among other things, log files, searched items, timeline data, and location history. Much of this data was included as exhibits to that report. Kaivac also submitted a declaration from Metzler describing the process and findings of his investigation, along with screenshots that supported some of his key findings. Additionally, Kaivac submitted Stillwagon's responses to its interrogatories and requests for documents and admissions. Kaivac thus amply

13

supported its motion for summary judgment with significant, detailed factual evidence from the record.

But more important than the form or quantity of this evidence is what it establishes. Among other things, it establishes the following facts, none of which Stillwagon seriously disputes: (1) for someone to have accessed Kaivac's YouTube channel to delete its YouTube videos, the individual would have needed to know and enter Kaivac's Google-account password; (2) Stillwagon knew Kaivac's Google-account password from his days as a Kaivac employee until Kaivac changed that password in April 2019 upon discovering that its YouTube videos had been deleted; (3) all of Kaivac's YouTube videos were deleted on or about April 14, 2019; (4) only two devices accessed Google services using Kaivac's Google account credentials during the time period when the videos were deleted from the YouTube Channels— the Kaivac-owned computer that Metzler used to conduct Kaivac business, and an iPhone 6 with the name "vince's iPhone"; (5) Metzler himself did not delete the videos from the YouTube Channels—he declared as much under oath and nobody (not even Stillwagon) accuses him of doing so; (6) Stillwagon used an iPhone 6 from the time he was employed at the company through July 2019, which included the period of time during which Kaivac's YouTube videos were deleted; (7) Stillwagon is the only individual who both (i) was given Kaivac's Google-account password, and (ii) went by the name "Vince"; and (8) while accessing Stillwagon's iCloud account, forensic analysts discovered a June 29, 2019 backup for an iPhone 6 with the identifier "vince's iPhone".

14

Moreover, forensic analyst James Daley concluded in his expert opinion that "[m]ultiple correlating data points" from Stillwagon's iPhone data and Kaivac's Google account provide sufficient evidence to show that the "vince's iPhone" that was recorded accessing the Kaivac Google account on April 16, 2019[4] "is the same device that was identified from a backup on [] Stillwagon's iCloud account." (Daley Expert Report, Doc. 29-1, #298 ¶ 34). Stillwagon never attempted to dispute that finding either.

It is hard to think of how Kaivac could have assembled a stronger case against Stillwagon short of catching Stillwagon on video deleting the YouTube materials, or having eyewitness testimony from someone who watched him doing so. Given the foregoing facts, a reasonable jury would necessarily conclude that "vince's iPhone" was the device that was used to delete Kaivac's videos and that "vince's iPhone" is the same phone that Stillwagon used during the time that the videos were deleted.[5]

---

[4] The expert report says April 15, 2019 but that is likely a typo and intended to refer to April 16, 2019 – the day that "vince's iPhone" twice logged on to Kaivac's Google account, as observed by Metzler.

[5] It is unclear whether Stillwagon disputes that "vince's iPhone" was his iPhone. During discovery, Kaivac asked Stillwagon to admit under oath that he had "used a device associated [with the] moniker 'vince's iPhone.'" (Sayre Decl., Doc. 29-4, #371). Stillwagon objected that the question was "[v]ague and ambiguous," and, while making clear he wasn't waiving that objection, also "denie[d] that he used a device associated with the moniker 'Vince's iPhone' (changing the small-v "vince's iPhone" into "Vince's iPhone"). (*Id.*, #376). But in response to Kaivac noting this denial in its statement of proposed undisputed facts, Stillwagon said that Kaivac had "misstate[d] [his] interrogatory response." (Resp. Br., Doc. 34-1, #463 ¶ 58). In any event, Stillwagon does not affirmatively say anywhere in his declaration that he has never used an iPhone labeled "vince's iPhone." And, given the mass of evidence that Kaivac has presented, the Court concludes that there is no genuine dispute that the iPhone 6 that Stillwagon used during and after his employment at Kaivac until he threw it away was the "vince's iPhone" at issue in this case. Other than his conclusory denial, assuming it is a denial, Stillwagon has no response to Daley's conclusions, based on his forensic analysis, that: (1) "vince's iPhone" is the "identifier of a phone that was associated with Mr. Stillwagon's

15

Add to those facts a couple more: Stillwagon has not suggested, let alone explained, *who else* might have used his phone to delete the videos. Nor has he offered any explanation about how he (or anyone else) might have *accidentally* deleted Kaivac's videos using his phone in April, 2019.[6] Thus far, the only conclusion that a reasonable jury could reach is that, through his iPhone 6, Stillwagon intentionally used Kaivac's password-protected Google account credentials to access and delete the video content on Kaivac's YouTube channels.

Stillwagon nonetheless claims that a genuine issue of material fact prevents the Court from granting summary judgment on these claims. To support his argument, he cites only his two-page declaration that he attached to his brief opposing Kaivac's motion for summary judgment. There, Stillwagon makes a number of self-serving statements (under oath) responding to Kaivac's claims, including that: he "ha[s] never intentionally deleted any materials or videos from YouTube or any other similar service, website, or network that belong to Kaivac, Inc." (Stillwagon Decl., Doc. 34-2, #465 ¶ 2); "[t]o the best of [his] knowledge, [he] ha[s] never deleted any materials or videos from YouTube or any other similar service, website, or network that belong to Kaivac, Inc." (*id.* ¶ 3); "[i]f [he] had wanted to destroy the

---

iCloud account" (Daley Expert Report, Doc. 29-1, 291); (2) a backup of "vince's iPhone" was found on Stillwagon's iCloud account (*id.*); and (3) that, in Daley's expert opinion, "vince's iPhone" is the "identifier for a phone Mr. Stillwagon used during his employment at Kaivac, through at least June 29, 2019" (*id.* at 298 ¶ 34). Accordingly, the Court accepts those facts as true.

[6] As explained later, Stillwagon suggests that he might have accidentally deleted Kaivac videos in February or March, but that wouldn't account for the videos that disappeared in April.

videos, [he] certainly would have had the opportunity to do so in the months and years immediately after [his] termination, as apparently, [his] log-in information was never changed and [his] access to the YouTube account in question was never restricted." (*id.* ¶ 5); "[he] had no reason to intentionally destroy the videos at issue in this case (*id.* ¶ 6); "[i]n Febraury or March of 2019, [he] deleted Kaivac videos from [his] own personal YouTube channel and account. [He] did not believe, understand, or intend that [he] was deleting files from anywhere other than [his] personal YouTube channel and [he] do[es] not believe [he] did anything other than delete videos from [his] personal account" (*id.* ¶ 7); "[he] did not physically sign into the Kaivac YouTube channel using their password at any time after [he] left employment with Kaivac. [He] do[es] not know or remember what their password is" (*id.* ¶ 8); "[he] ha[s] never used or seen a Kaivac tech support channel. This channel was created after [he] left Kaivac. [He] never knew or was provided that password." (*Id.* ¶ 9).

These statements amount to little more than misdirection and conclusory denials that fail to create a genuine dispute of material fact. *See Sigmon v. Appalachian Coal Props.*, 400 F. App'x 43, 48–49 (6th Cir. 2010); *see also Shaw v. Danley,* No. 98-6579, 2000 U.S. App. LEXIS 545, at *19–20 (6th Cir. 2000); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

Stillwagon comes closest to reconciling his steadfast denials of wrongdoing with Kaivac's mountain of evidence against him when he admits that he deleted

17

videos from his "personal" YouTube account in "February or March of 2019," but did not think he was deleting videos from Kaivac's YouTube account. (Stillwagon Decl., Doc. 34-2, #465 ¶ 7). Stillwagon appears to be suggesting that he may have deleted Kaivac's videos, but not intentionally, because he thought he was only deleting them from his "personal" account. (Stillwagon Resp. Br. at #456 ("In a variety of legal contexts, willfulness of conduct is a quintessential issue of fact, not easily susceptible to summary judgment.")). But, beyond claiming that he deleted videos on those dates, Stillwagon never develops the intent argument or the factual basis for it. It's not even entirely clear that he *is* making that argument. And, if he is, the argument has at least two fatal flaws.

*First*, it's simply implausible, at least without more facts than Stillwagon provided, that someone as well acquainted with the workings of Kaivac's YouTube account as Stillwagon would mistake that account for his personal YouTube account. Between 2015 (the year that Kaivac created its YouTube account) and April 5, 2017, Stillwagon was a member of Kaivac's sales teams, and it is undisputed that the sales team was tasked with uploading videos onto Kaivac's YouTube channels. Stillwagon admitted that he personally uploaded YouTube videos to Kaivac's YouTube channel. (Stillwagon Resp. Br., Doc. 34-1, #459 ¶ 11). The record even contains an email he sent to his colleagues in 2016 in which he provides the link to two Kaivac YouTube videos, explains that he uploaded them to the channel, and asks his colleagues to let him know if they had any questions. (Robinson Decl., Doc. 29-3, #363). Stillwagon never explains why he supposedly thought he had Kaivac's YouTube videos on his

18

personal YouTube page, nor, even if he did, how he could have confused the two pages. Had he provided facts like those (if they exist), perhaps that could have created a genuine issue as to whether Stillwagon knowingly or intentionally deleted Kaivac's YouTube videos. But, on its own, Stillwagon's conclusory assertion—that he thought he was only deleting videos on his personal YouTube page—does not create a genuine issue of material fact.

*Second*, and more simply, even if the Court accepts Stillwagon's statement as true, the statement is irrelevant. It is an undisputed fact that Kaivac's videos disappeared from its channels in *April*, not February or March. So accidental deletions that occurred in February or March fail to explain how or why "vince's iPhone" deleted Kaivac's YouTube videos on or around April 14, 2019. And, again, a reasonable jury could only conclude that "vince's iPhone" was the device that was used to delete Kaivac's videos at that time. The only other device that accessed Kaivac's Google account around that time was Metzler's work computer, which only Metzler used, and nobody (not even Stillwagon) suggests that Metzler deleted Kaivac's videos.

Next consider Stillwagon's statement that "[he] did not physically sign into the Kaivac YouTube channel using their password at any time after [he] left employment with Kaivac" and that he did "not know or remember what their password is." (*Id.* ¶ 8). The Court is unsure, and Stillwagon does not explain, what Stillwagon means when he says he did not "physically" sign into Kaivac's YouTube channel. Again, Stillwagon's conclusory assertion in that regard is insufficient to create a genuine

19

issue of fact given the mountain of evidence that Kaivac has amassed. For example, Stillwagon did not dispute Daley's finding, included in his expert report, that for a device "[t]o access the account in such a way as to display on the 'My Recent Devices' log, the account username and password must be entered on a web page for a Google product." (Daley Expert Report, Doc. 29-1, #291). Nor did Stillwagon dispute Metzler's sworn statement (backed up by a screenshot) that Metzler identified "vince's iPhone" on the "My Recent Devices" log in Kaivac's Google account. If Stillwagon's assertion that he did not "physically" sign in merely means that Kaivac's username and password were pre-loaded into Stillwagon's phone so that he did not need to re-enter them in order to access information or content associated with Kaivac's Google account (such as the YouTube content on Kaivac's channels), that is immaterial. The relevant statutes and contractual provisions prohibit the unauthorized *use* of the password, not the *method* by which Stillwagon used it.

Stillwagon fails as well to create a genuine issue of material fact with his suggestion that he could not have deleted videos from Kaivac's tech support channel because that channel was created after he left Kaivac and thus he never knew that channel's password.[7] That argument doesn't work because it rests on the erroneous premise that the password for the Kaivac Tech Support channel was different from

---

[7] As noted in the fact section, the Kaivac employee responsible for maintaining the YouTube channels states in his declaration that both channels were created in 2015. Stillwagon's claim that Kaivac created one of the channels after he left Kaivac is inconsistent with the Kaivac employee's sworn statement. While that is a "dispute," however, it is not a dispute as to a "material fact." As described above, there is no dispute that the passwords for the two channels were the same, as both were associated with the same Kaivac Google account. Thus, whether the channel was created before or after he left is immaterial to the question of whether he had the ability to access it, which is the only question that matters here.

the password for the Kaivac in the Field channel. It wasn't. Both channels were housed in Kaivac's Google account, and the password for that account was one and the same. Kaivac provided Stillwagon that password so he could upload videos onto the Kaivac in the Field channel. But, by virtue of having that password, Stillwagon had the ability to delete videos on *both* channels until Kaivac changed the password, which did not occur until *after* the videos had been deleted. (Metzler Decl., Doc. 29-2, #336–37, 339 ¶¶ 11–14, 27).

Stillwagon also tries to create a genuine issue of material fact by asserting that he "had no reason to intentionally destroy the videos" and that, had he wanted to, he could have deleted the videos much earlier than he allegedly did. Stillwagon essentially invites the Court to speculate about why he would want to delete Kaivac's videos or why he would have waited so long to do so. But Stillwagon cannot avoid summary judgment merely by sowing "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *accord Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). Stillwagon needed to come forward with significant probative evidence to counter the overwhelming evidence that Kaivac amassed against him. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347. Pointing to uncertainties about his motive or why he would delay engaging in wrongdoing does not cut it, especially as none of the claims at issue here turn in any way on the motive for the conduct at issue.

The remaining statements from his declaration on which Stillwagon relies constitute nothing more than conclusory denials of wrongdoing that fail to raise a

genuine issue of material fact. (*See, e.g.*, Stillwagon Decl., Doc. 34-2, #465 ¶ 2 (asserting that he "ha[s] never intentionally deleted any materials or videos from YouTube or any other similar service, website, or network that belong to Kaivac, Inc."); *id.* ¶ 3 ("[t]o the best of [his] knowledge, [he] ha[s] never deleted any materials or videos from YouTube or any other similar service, website, or network that belong to Kaivac, Inc.")).

Kaivac has shown there is no genuine dispute that Stillwagon intentionally deleted its YouTube videos. Accordingly, the Court **GRANTS** Kaivac summary judgment as to liability on its first, third, and fourth claims for relief.

## B. Kaivac is Entitled to its Attorneys' Fees.

The Court's award of summary judgment on Kaivac's vandalism claim (the third claim) makes Kaivac's request for attorneys' fees a straightforward matter. That is because O.R.C. § 2307.70(A), the statute that creates a cause of action for any person who suffers loss of property because of a violation of 2909.05 (the vandalism statute), allows a successful claimant to "recover … reasonable attorney's fees incurred in maintaining that action." Because R.C. 2307.70(A) "provides an award of [reasonable] attorney's fees," it is "proper" for the Court to award Kaivac those fees as an "exception[] to the American rule." *Bros. v. Nixon*, 157 N.E.3d 164, 171–72 (Ohio Ct. App. 2020). The Court thus determines as a matter of law that Kaivac is entitled to its reasonable attorneys' fees.

Whether Kaivac has yet substantiated the appropriate amount of that award, though, is a separate question. Under Ohio law,[8] a party seeking an award of attorneys' fees bears the burden of showing that the fees are "reasonable." *See In re Verbeck's Estate*, 184 N.E.2d 384, 385 (Ohio 1962). Ohio's Supreme Court has noted that Ohio's approach to that issue is "guided by decisions issued by the United States Supreme Court." *Phoenix Lighting Grp., L.L.C. v. Genlyte Thomas Grp., L.L.C.*, 153 N.E.3d 30, 35 (Ohio 2020). In that regard, the *Phoenix* Court particularly pointed to *Hensley v. Eckerhart*, in which the Supreme Court observed that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." 461 U.S. 424, 437 (1983); *see also Nw. State Cmty. Coll. v. Nw. State Cmty. Coll. Educ. Ass'n, OEA/NEA*, 79 N.E.3d 1127, 1137 (Ohio Ct. App. 2016) ("The party requesting attorneys' fees bears the burden of proof to show that the request was reasonable."); *Miller v. Miller*, No. 109125, 2020 WL 6625040, at *4 (Ohio Ct. App. Nov. 12, 2020) (slip copy) ("The party seeking an award of attorney fees must demonstrate the reasonableness of the requested fees."). Moreover, "[t]rial courts should not speculate as to whether the hours were necessary or that the fee itself was reasonable." *Nw. State*, 79 N.E.3d at 1137.

Here, Kaivac submitted multiple declarations attesting to the fact that it incurred $102,388.75 in attorneys' fees in maintaining this action to date. (Towes

---

[8] Because Ohio law authorizes the award of attorneys' fees, the Court also looks to Ohio law to determine the amount of those fees. *Reeser v. Henry Ford Hosp.*, 695 F. App'x 876, 879 (6th Cir. 2017). Even were that not the case, Ohio's approach to determining reasonableness is the same as the approach under federal law. *See Phoenix Lighting Grp., L.L.C. v. Genlyte Thomas Grp., L.L.C.*, 153 N.E.3d 30, 35 (Ohio 2020).

Decl., Doc. 29-6, #405 ¶ 14; Spievack Decl., Doc. 29-5, #379). But it has not provided the information that the Court would require to determine that these fees are reasonable. Indeed, so far as the Court can tell, beyond asserting the aggregate total, the only documentation that Kaivac's lawyers have supplied to date are the periodic statements that they provided Stillwagon's counsel, in accordance with this Court's standing orders. But, consistent with those standing orders, those documents merely showed the total number of hours they had expended and the total amount of attorneys' fees Kaivac had incurred during that period. (Spievack Decl., Doc. 29-5, #394–402). The purpose of that provision in the Court's standing orders is not to suggest that such reports suffice to establish reasonableness, but rather only to ensure that the opposing party is generally on notice, during the pendency of the litigation, of the magnitude of a fee award that may be sought down the road. If a party seeks such an award, it still bears the burden of proving its entitlement to it.

In short, Kaivac has not yet met its burden of showing that the fees incurred to date are reasonable. And there is also an additional problem. This case is not yet over. Kaivac has obtained summary judgment as to liability on three claims, but has yet to prove the damages associated with any of them. Presumably, it may claim that its entitlement to attorneys' fees may extend to attorneys' fees undertaken in that effort. Stillwagon, by contrast, may argue that some of the fees, whether already incurred, or yet to be incurred, are not related to the statutory claim that provides for a fee award, or otherwise are not reasonable—arguments it cannot meaningfully press until it has more detailed billing information. Accordingly, for present purposes,

the Court merely determines that Kaivac has shown, as a matter of law, that it is entitled to the reasonable attorneys' fees it incurred in the prosecution of its action under Ohio's vandalism statute. The Court will leave for the damages portion of these proceedings any further determination as to what the amount of that award will be.

## B. Kaivac is Not Entitled to Summary Judgment on its Intentional Spoliation of Evidence Claim.

The last claim on which Kaivac seeks summary judgment is its claim for intentional spoliation of evidence under Ohio law. The Court denies Kaivac's motion on that claim, due to two concerns. First, the Court is not convinced that an Ohio-law-based claim of spoliation is even available to Kaivac in this action. Second, even if it were, Kaivac has failed to show that it is entitled to judgment as a matter of law on that claim.

Let's start with the first of those. The parties seem to take it as a given that Ohio law governs Kaivac's spoliation claim. If that is correct, then a spoliation claim is at least a possibility. While the Ohio Supreme Court's latest decision on the matter is not exactly a ringing endorsement of the independent tort of spoliation, *see Elliot-Thomas v. Smith*, 110 N.E.3d 1231, 1234–35 (Ohio 2018), at least for now it appears that Ohio continues to be one of the few states that recognizes that tort claim.

But the Court is not as sure as the parties appear to be that Ohio law controls the spoliation issue here. This case is before the Court both under federal-question jurisdiction, *see* 28 U.S.C. § 1331, and under diversity jurisdiction, *see* 28 U.S.C. § 1332. (First Am. Compl., #195–96, ¶¶15, 16). The former is predicated on the CFAA claim, which arises under federal law. But Kaivac also adds state-law claims to its

Complaint. As to those claims, Kaivac asserts pendent jurisdiction, *see* 28 U.S.C. § 1367, which is available as long as those claims arise out of a common nucleus of operative facts. (*See id.*). But, given Kaivac's allegations of diversity, those claims presumably also may be before the Court as a matter of the Court's original jurisdiction under 28 U.S.C. § 1332.

Whichever of those two jurisdictional paths one may wish to traverse, an argument could be made that the Court has jurisdiction to consider an Ohio-law-based spoliation claim. And, in fairness, it does appear that federal courts in Ohio have entertained such claims in the past. *See, e.g.*, *Carovac v. Lake Cnty. Bd. of Developmental Disabilities/Deepwood*, No. 1:19 CV 2344, 2020 WL 5423966 (N.D. Ohio Sept. 9, 2020); *Robinson v. Target Corp.*, No. 4:17CV1566, 2019 WL 4862065 (N.D. Ohio Oct. 2, 2019); *Miller v. Target Corp.*, No. 3:13-CV-216, 2014 WL 5531654 (S.D. Ohio Nov. 3, 2014).

The Court, however, is not entirely convinced that this approach works here. In this case, Kaivac is seeking a remedy for what it alleges Stillwagon did *in response to the filing of this federal court action*. That is, Kaivac wants a remedy for Defendant's alleged conduct in this exact litigation. Further reflecting that, Kaivac's original Complaint did not include such a claim. Rather, Kaivac amended its Complaint based on what it believed Stillwagon did after learning that Kaivac was seeking to serve him. That presents a wrinkle. The en banc Sixth Circuit has confirmed that this Court's power to impose a sanction for litigation conduct—and specifically in response to allegations of spoliation—is exclusively a matter of the

26

Court's inherent power, and is thus controlled by federal law, not state law. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc) ("[T]he authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, from a court's inherent power to control the judicial process.") (internal quotation omitted). And, while federal law allows a court to sanction a party for spoliation, there is no independent federal-law-based tort of spoliation. *R.C. Olmstead, Inc. v. CU Interface*, LLC, 657 F. Supp. 2d 878, 887 (N.D. Ohio 2009); *Lombard v. MCI Telecomms. Corp.*, 13 F. Supp. 2d 621, 628 (N.D. Ohio 1998). Thus, it is not at all clear that the Court can enter judgment on such a claim (if it is a federal-law-controlled spoliation issue), even if the Court otherwise were able to impose sanctions based on the underlying conduct.

To be fair, no party raised this issue in its briefing. So the Court's view on this matter is necessarily preliminary. And the overlap between spoliation as sanctionable conduct, on the one hand, and spoliation as an independent Ohio-law-based tort, on the other, can lead to some confusion. *See Miller*, 2014 WL 5531654 at *3 n.1 (explaining the importance of considering the different sources of authority for remedying spoliation).

As noted immediately below, however, even if Kaivac can assert the independent Ohio-law-based tort, Kaivac has failed to make the necessary showing, as a factual matter, to render summary judgment in its favor on that claim appropriate. Accordingly, as Stillwagon has not sought summary judgment on, or dismissal of, this claim, the Court need not reach a final resolution on the legal

27

viability of the claim at this time. But, if Kaivac elects to move forward with its spoliation claim in this matter, the Court urges the parties, in addition to addressing the evidentiary issues further described below, also to consider the legal issue of whether an Ohio-law-based spoliation claim is even available, given the procedural posture of this case.

The Court now turns to its remaining concern. As the previous paragraph alluded, the Court rejects Plaintiff's request for summary judgment on the merits. More specifically, even assuming Kaivac can press an Ohio-law-based spoliation claim, Kaivac has failed to show that the undisputed facts warrant entry of judgment in its favor on this claim.

To prevail on a claim for the independent tort of spoliation under Ohio law, a plaintiff must establish that there was "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of plaintiff's case, and (5) damages proximately caused by defendant's act." *Elliot-Thomas*, 110 N.E.3d at 1233 (internal quotation omitted).

Here, Kaivac's claim is based on the following undisputed facts: After Kaivac filed its lawsuit against Stillwagon on May 30, 2019, it made numerous attempts to inform him of that. (Original Compl, Doc. 1). That day, one of Kaivac's lawyers, Russell S. Sayre, sent an email to stillwagonv@gmail.com, an email that Kaivac thought Stillwagon used. The email attached a copy of the original complaint in the case. (Sayre Decl., Doc. 29-4, #367). That email went unanswered. (*Id.*, #364 ¶ 4). On

28

June 4, 2019, Sayre sent an identical email to another email address that it thought Stillwagon used: stillwagonvincent@gmail.com. This was the same email that Stillwagon had listed on his LinkedIn page. Again, Sayre's email went unanswered. (*Id.* #365 ¶ 7; Am. Compl., Doc. 24, #225). On June 25, 2019, a process server unsuccessfully attempted to serve Stillwagon at 817 Mark Avenue, Hamilton Ohio, the residence of Lisa Ride. (Spievack Decl., Doc. 29-5, #378–78 ¶¶ 4–5). Kaivac believed that Stillwagon could be found there because it was his last forwarding address on record with the United States Postal Service, and because Kaivac believed that Riede and Stillwagon had been romantically involved at one time. (First Am. Compl, Do. 24, #202 ¶ 45). Later that day, Kaivac executive Robert Robinson Jr. received a text message on his mobile phone from Riede explaining that not only did Stillwagon not live with her, he did not live anywhere in Ohio. She also requested that Robinson inform Kaivac's attorneys that they did not have the correct address. (*Id.* at #231). Eventually, Kaivac located Stillwagon at an address in Michigan: 14354 Maple Drive, MI 49117. Kaivac's process server unsuccessfully attempted service there on July 9, 11, 12 and 16, 2019. (Spievack Decl, Doc. 29-5, #378 ¶ 5). One of Kaivac's lawyers, Andrew A. Spievack, also called Stillwagon's cellphone on July 11, 2019. On July 22, 2019, Kaivac's process server successfully served Stillwagon with the summons and complaint at the Michigan address. (Kaivac Proposed Undisputed Facts, Doc. 30-2, #438 ¶ 56).

Kaivac argues that Stillwagon was "repeatedly notified of this lawsuit between May 30, 2019 and service of process on July 22, 2019." (Kaivac Opening Br., Doc. 30-

1, #425). And, it is undisputed that, between June 27, 2019, and June 29, 2019, Stillwagon deleted 2639 files of Web History data from his iPhone 6 ("vince's iPhone"). (Daley Expert Report, 29-1, #294–95). It is further undisputed that he deleted 329 out of 330 records of Safari Searched Items from the same iPhone sometime after June 24, 2019. (*Id*.). It is also undisputed that Stillwagon threw away this iPhone sometime in July 2019. (First Am. Compl., Doc. 24, #259). Kaivac doesn't attempt to identify a particular date by which Stillwagon was aware of the lawsuit. Rather, Kaivac seems to argue that, whatever the date, Stillwagon was aware of the lawsuit and Kaivac's claims against him by the time he deleted the aforementioned data and threw away his iPhone.

Given the elements of the claim, coupled with the facts set forth above, the resolution of this claim comes down to whether Kaivac can show that there is no genuine dispute that Stillwagon knew about Kaivac's lawsuit against him before he deleted the data and discarded his iPhone. On this front, Kaivac fails to carry its burden. Stillwagon put forth enough probative evidence to create a genuine issue as to whether he knew about the lawsuit before he deleted the data and threw away his iPhone.

In his declaration, Stillwagon states that the first email address that Sayre tried to email him at is a "junk" email account, meaning, "not one he monitors or uses regularly." (Stillwagon Decl., Doc. 34, #466 ¶ 10). He goes on to state that, as of June 23, 2020, there were approximately 90,000 unopened messages in that account. After Kaivac filed its motion for summary judgment, Stillwagon says he checked this

30

account and located an email from Sayre dated May 30, 2019. But to this date, the email remains unopened and Stillwagon did not know (at least until this lawsuit) what it said. (*Id.*). Kaivac does not dispute any of this. As for the second email address at which Sayre tried to reach Stillwagon—the one from Stillwagon's LinkedIn page—Stillwagon states that it "is not and has never been [his] email address." (*Id.* ¶ 12). "If Linkedin stated that [was his] email address," then Stillwagon says that "[was] a typo and/or incorrect information." (*Id.*). Moving on to Riede's address in Ohio, Stillwagon says that it has never been his address, nor has he ever resided there. (*Id.* ¶ 10). Riede's text message to Robinson provides at least partial support for that claim. Furthermore, Stillwagon's conduct in deleting the data in June is consistent with his argument that he did not intentionally destroy evidence because he was not formally served until July. As for discarding the phone, Stillwagon says he did so in July 2019—or, more accurately, that he left it with an AT&T store in July 2019 because it was broken, and that the store presumably discarded it. That, too, is consistent with his story that he did not intentionally destroy evidence, assuming that he discarded the phone before he was served on July 22 or otherwise made aware of the nature of the action against him.

The Court finds it odd that Stillwagon does not explicitly say that all of these events occurred before he became aware of this action, but that point seems to be implied by his declaration and brief taken as a whole. The Court also finds it odd that Stillwagon did not respond to Spievack's sworn statement that Spievack left him a voicemail on July 11 informing him about the suit. But that seems to have been an

oversight on Stillwagon's part. Again, taken as a whole, Stillwagon's declaration and motion suggest he did not listen to the voicemail (perhaps he just missed it) and that he only became aware of the lawsuit after he was formally served on July 22.

At bottom, drawing all reasonable inferences in favor of Stillwagon (which the Court must at this stage), the Court concludes that there is a genuine dispute as to whether Kaivac intentionally destroyed evidence that he knew was relevant to this lawsuit. The parties sketch dueling narratives about when Stillwagon knew about the suit. Kaivac points to the myriad attempts it made to inform Stillwagon of its suit against him. Stillwagon responds to nearly every point that Kaivac makes, setting forth specific (even if improbable) reasons for why none of Kaivac's attempts to inform him of the suit were successful until he was formally served process. On a motion for summary judgment, the Court may not weigh each side's evidence and choose which among these competing narratives is more likely. That job is for the jury. Thus, even assuming Kaivac can bring an independent spoliation claim under Ohio law in this action, an issue that the Court has yet to reach, the Court nonetheless **DENIES** Kaivac summary judgment on that claim based on this disputed issue of fact.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** Kaivac's Motion for Summary Judgment and Attorney's Fees. The Court will set this matter for a telephonic status conference shortly to discuss scheduling the matter for a Final Pretrial Conference and Jury Trial on the issues that remain.

**SO ORDERED.**

January 19, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**